The next case is 18-1511, Bt. of Trustees of University of Illinois v. Micron Technology, Mr. Somerville. Thank you, Your Honor. Good morning, Your Honor. It's George Somerville, on behalf of the University of Illinois, and may it please the Court. This is an action for breach of contract. It's a license agreement that was at issue in Lowe's, so I'd like to turn right off the bat to the provision in question. This is found in Attics 93, and it is paragraph 2C from the agreement, and it says, if company wishes to license for commercial use by company such intellectual property owned by university, then the requisite licenses for such intellectual property from university would be granted to company pursuant to a separate written license agreement to be negotiated in good faith between the parties containing such reasonable terms and conditions as mutually agreed to between the parties. So why isn't the natural meaning of that language that if you want a license, then any licenses that you need from any law that might oblige you to get one, we, the university, will negotiate in good faith about. So the requisite doesn't itself impose on you an obligation to get the licenses. That obligation comes from any source of law like patent law, and this is a sentence that commits the university to something, not you to something. I mean, not them to something. So a couple points, Your Honor. First of all, the language of that provision, the word requisite, isn't the thing that obliges the university. There is language in there. No, that's right, but what the university is obliged to do is to negotiate in good faith with Micron for any licenses Micron, under law, requires from the university. But again, the agreement characterizes the licenses as requisite. Yeah, but it also says if you want a license, you've got to get the requisite licenses. That doesn't seem to me to say if you want to commercialize it, you've got to get licenses. Because if you want a license, you've got to get the licenses. I mean, that really doesn't help you very much. There are two responses. First of all, if that's all that this provision means, it's effectively superfluous, because that would be true whether there was a contract or not. Obviously, a company is- Why would the university be obliged to negotiate in good faith with you at a reasonable rate or whatever? Yes, at reasonable terms, you could just say, go away. It's our patent. That's true, Your Honor, but- So this provision does do some work. Except that if the parties couldn't agree on those reasonable provisions, there wouldn't be a license that would ensue. But did Micron ever seek to enter these negotiations at all? No, Your Honor, it did not. It simply commercialized the technology. So even if it was your obligation, you never were put in a situation where you had to exercise it? That's true. Micron never came to the university to say we would like a license because we were going to commercialize your technology. So the university never had the opportunity to negotiate those terms. But that's on Micron, not on the university. Isn't it true that you didn't make this requisite argument below? What we argued below was the terms- Please answer my question. Is it true that you didn't make the requisite argument below? We didn't call it requisite specifically. That's correct, Your Honor. But what we did say was that the agreement on its face, and this, by the way, is in the face of a decision that the district court had already issued that said that our construction was the most reasonable, that Micron had the onus to seek a commercial license if it sought to commercialize the technology. So it was that context that we were arguing on summary judgment. The court basically did a reversal of its position on what the agreement- So this is an interesting point to me. So the district court said that that provision was a reasonable reading. The position that you were advocating was a reasonable interpretation of the contract. Then later it said, ah, there's another reasonable interpretation of the contract. And that was Micron's position. Is that right? That is correct. But the only thing that changed between the time that the court issued its original determination that said that ours was the most reasonable, and the time that it said, well, Micron has a reasonable position too, was that Micron had filed for summary judgment and had provided evidence extrinsic to the work agreement. So under Illinois' law, what happens when a court finds two reasonable interpretations to a contract clause? Does that create a genuine issue material fact? Yes. If there's a question about what the extrinsic evidence means, then it creates an issue of fact for the jury. And here our position is that if the court was correct in resorting to the extrinsic evidence, which we don't believe is right, then there is an issue of fact as to what that extrinsic evidence meant. Well, so I guess, what's wrong with thinking about it this way? There's a threshold question about whether, as a matter of law, there's ambiguity. Let's assume, for purposes of this question, that there's a conclusion, there's ambiguity. So now you have to look outside the four corners of the document and various things may be relevant. In general, that's a fact question. But why isn't it true that, like any fact question, the record may be such that summary judgment is appropriate in the resolution of that fact question? Clearly, if the facts were such that no reasonable jury could find for us, then that is something that's appropriate for resolution on summary judgment. But that is not the case here. Why isn't that case the case from the history of the departure from U of I's template? The template said something quite different from what Micron got U of I to agree to here. And this language no longer imposes an obligation on U of I. We disagree. I mean, on Micron, I'm sorry. We disagree. We think that that language does impose an obligation on Micron. And could the language have been clearer? Sure, as is the case with pretty much any contract out there. But I mean, I really don't understand how you can possibly read this as to say that Micron had an obligation to get a license to commercialize this. Now, you talked about that one sentence. Is there any other argument? Is it just the use of the word requisite in there? Well, in general, you know, a law says answer, answer. Is it just the use of the word requisite? Well, no. It's the fact that there is a provision that addresses what happens in the event of commercialization at all. There would be no need for that. And in effect, the contract in other places says what Micron can and can't do with these annealed wafers. So it's very clear that Micron was able, under the license that was granted in the work agreement, to analyze the wafers for non-commercial purposes only. So that limitation is already there. So the question is, why is there a mention of a commercial license at all in the work agreement? Are you arguing that they misused the wafer analysis? No, Your Honor. They used the wafers for internal purposes. But then they went ahead and commercialized the intellectual property. Because again, the work agreement is- But not based on their wafer analysis. It's a little unclear, Your Honor. But we're not relying on that as the reason for our breach of contract. There's nothing in the agreement that says you need a commercial license unless you independently develop the products that practice the intellectual property. Perhaps that's because there isn't anything in the agreement that says you need a license if you commercialize it. Your Honor, we think paragraph 2C is clear. And as a matter of fact, the district court agreed with us. That was the district court's original conclusion. It read this provision and said, this is the most reasonable interpretation of the contract. I guess, let me just ask again. You've said a couple of times that even putting aside the word requisite, you've asked rhetorically, what else would the existence of a provision about commercial licensing do? And I guess I'm having trouble understanding why the answer isn't fairly simple. This says the university thinks we have some IP rights. And therefore, Micron is getting from the university in this provision a promise that the university will negotiate in good faith, reasonable terms if Micron seeks such a licensing. But then the question, Your Honor- So it does work. But it does work by imposing, by giving Micron something, not by giving the U of I something. Then the question, Your Honor, is what consideration did the university get? And the answer is nothing, effectively. That's not the case because the Micron agreed to analyze the wafers, right? And that doesn't adhere to the benefit of the university, Your Honor. Basically, Micron was interested in knowing what would happen to its wafers. Sure, it benefits the university. They agreed to take a look at the wafers and to decide and to consider whether they wanted to take a license. So they started down the path of doing the research that was necessary to help them make that determination. They agreed to do that, no? No, Your Honor. That's not what this agreement is about at all. Did they agree to analyze the wafers? No, they agreed to anneal them under a process that was proprietary to the university and then give the wafers back to Micron. Okay, so they agreed to do something, right? But they agreed to take on work for Micron's benefit. The question is, what did the university get in return? Well, if it turned out that the annealing process made for better chips than Micron and if it turned out that U of I had a valid patent covering it, then Micron might come back and say, we want to make 500 million of these chips using your process, so we'd like to pay you money. That would be true whether or not this license existed. The point is, the university, if Micron is right on its construction, the university was obliged to perform this annealing process for Micron at Micron's specifications, give the wafers back to Micron in a timely fashion, and let Micron do with them internally what it would. And the university got nothing. It didn't get paid. That's Article 2A of the work agreement. So the only reason the university entered into this and any other agreement was to ensure that if it was performing these kinds of processes for commercial entities, that it wouldn't have to fight infringement battles down the road if the company decided to commercialize the very intellectual property that the university used to perform this work. And yes, the language of this agreement is... Suppose somebody agrees to, with a patentee, to use their technology to do an analysis of a sample with the idea that such an analysis might lead the company doing the analysis to seek a broader agreement. That's not consideration? I would think in that circumstance, no, there is no consideration because that's a mere agreement to agree. Again, that would be an agreement to agree, and the license agreement wouldn't have to provide for that. No, it's not an agreement to agree. It's just an agreement that we're going to spend some resources to do an analysis that will inform a possible license agreement later on. Your Honor, at least in our view, that means that effectively the university is doing work that it's obliged to do, and Micron then has the ability to do whatever it wants down the road, take a license, not take a license, infringe patents, not infringe patents. That's not the nature of consideration. It's just not tangible. And so while the university... Your consideration was that you got to see a real-world application of the process, of your payment process. But the university didn't need Micron for that, Your Honor. There are wafers available that the university could have purchased and performed all of these tests, and the university wasn't able to analyze them once these tests were performed. It was only Micron. The university gave them back. So effectively, Micron annealed these wafers and sent them back to Micron. So the knowledge base that the university gained from this is effectively zero. The only party that benefited from this is Micron. Well, the result was that the annealing process did not help. It was that experiment under this agreement was a failure. That's according to Micron, yeah. Let's go back to the purpose. The real purpose of the agreement, or the stated purpose, is that this is a work agreement. Seems to me to be a pre-CREDA agreement. It's a cooperation agreement between the university and the private sector in order to help train your PhD students. No, Your Honor. Again, Micron wasn't necessary for that. Dr. Lighting had his own materials that he could work with, and in fact did. So we didn't need Micron to have Dr. Lighting train his PhD students. There were materials out there independent of Micron that the university could have used. So it wasn't as if Micron was saying, look, we know you don't have wafers. We'll provide them to you so that you can run these experiments to your benefit. That's not what this was about. That's not what the agreement provides. This is material that's proprietary to Micron. The university wasn't able to analyze it. It wasn't able to do anything with it except perform the annealing and send it back so that Micron could then figure out what the benefit was. And the university, according to Micron, was entitled to zero in return. There was no compensation for the work itself. And according to Micron, it had the right, if it felt like it, not to take a license to infringe patents and then force the university to come after Micron for patent infringement. Your Honor, I see that I'm in a little time. Yeah, we'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. Schertzer. Good morning, Your Honors. Adam Schertzer on behalf of Micron Technology. May it please the Court. Your Honors, I want to go straight to the issue regarding the seven-year pending litigation, seven years as of two days from now. What made the district court change its mind? At the very beginning, it said that the university's interpretation was the most reasonable interpretation. What happened after that that caused the change? And I understand the court made that decision at the motion to dismiss stage, correct? That's correct. So they survived the motion to dismiss on the basis that their interpretation was the most reasonable interpretation. That's correct. But I want to make sure the record is clear as to the full scope of the district court's determinations. So at page 136 of the appendix, this is the court's decision with respect to the motion dismissed. I'll wait for the panel to get to that page. I'm sorry, page what? Page 136 of the appendix. There is no such page in the appendix. Yeah, there is. 136. Are you looking at the other appendix? I'm looking at the wrong appendix. Excuse me. Sorry about that. No worries. Too many cases with the same thing. OK, why don't you go ahead. I'll get there. There are many cases here, Judge Rogers. Apologies. All right, so page 136 in that first paragraph, about halfway through that first paragraph, the district court states, the university's amended complaint plausibly pleads that it has suffered contract damages in the form of lost potential royalties, colon. And it's almost as if the district court's stating what the university has pled. And she restates that. I'm not on the same page. You said 137? 136, Your Honor. 136. So the district court ends with a colon in that clause there, and then sort of restates what the court interprets to be the university's pleading there, that it's their position that the most reasonable reading of the contract called for Micron to seek a license. If you turn then to page 139 of the appendix, where the court restates essentially the issue that the university raised with respect to its understanding of the work agreement. And there, the district court states that A, rather than the most, but A, reasonable interpretation of the work agreement, however, conditioned the transfer on Micron's promise to seek a license from the university if it ultimately sought to put the university's processes to commercial use. So it's clear, even with the same motion to dismiss opinion, that the district court didn't view the university's position as a judgment, ultimately, on the proper interpretation. It's a legal question, right? The question of whether the agreement's unambiguous. You say it's unambiguous. We do say it's unambiguous, and it's unambiguous in Micron's favor based upon the most natural reading of the language, if company wishes to license. That's the predicate to this new argument. Is that what you argued below? Yes, that is what we argued below. We argued below that the natural reading of the agreement, the unambiguous language of the agreement, was that if Micron wishes or desires to obtain a license, then Micron would then seek that license from the university. But we never limited our arguments, for example, to- Did you object to the court turning to extrinsic evidence? Well, so in our summary judgment motion, we argued both, and we argued the- Okay, that's what I thought. Right, we argued both. We argued that there was an unambiguous interpretation of this agreement, but if the court determined that there was not an unambiguous interpretation of this agreement in Micron's favor, then certainly if there was an ambiguity to resolve, it could be resolved based upon undisputed facts in the record on summary judgment. Just to be clear, you made the argument- Did you make the argument that you were unambiguously right, not only in summary judgment, but at the 12B stage also? Was that a basis for your motion to dismiss? On our basis for the motion to dismiss, we were not arguing the unambiguous interpretation of Clause 2C. We focused primarily on the liability-limiting clause, Section 6, and the district court actually went into- Which is why at page 136, that's what the judge is discussing. That's right. The judge is discussing- the judge goes on from the paragraph that I highlighted for the panel here, and goes on to discuss Micron's argument with respect to the liability-limiting clause, and the district court viewed that as necessary because if Micron were correct as to its interpretation of the liability-limiting clause, then even under the university's interpretation of Clause 2C, there was no breach of contract claim to move forward. And the district court ultimately determined that there was an ambiguity there as well, and determined to allow this case to move forward under the Rule 12 standard that it determined the university had met. And so the case proceeded from there. Now, the other thing that we've argued, Your Honors, that was not touched on before is the fact that there are four alternative bases for affirmance here. Those alternative bases for affirmance, any one of which would result in an affirmance by this panel, would resolve this appeal without the court actually reaching any of the particular contract interpretation issues. Can I get back to the issue actually decided here? Suppose we were, just for purposes of this question, to conclude that the language here is ambiguous, so that evidence outside the four corners of the document is legitimately considered, and indeed, summary judgment is one way of doing that. Why is this a case in which the evidence submitted, the extrinsic evidence submitted, the drafting history, some of the testimony from U of I's negotiator, why does that not create a triable issue of fact? Well, there's no material issue in dispute with respect to the extrinsic evidence. The district court analyzed the migrant's arguments with respect to the extrinsic evidence and also completely analyzed the university's arguments with respect to- But that's a point about the process. The process worked well, but in order for there to be summary judgment, again, on the assumption that there is ambiguity, there would have to be only one reasonable fact finding that could be drawn from this evidence. And why does the evidence, in your view, rise to that level? Well, below, Your Honor, the university only raised one particular portion of the testimony in the record with respect to Leslie Miller Nicholson's testimony below. Now, on appeal, they've raised six different citations to various testimony below, attempting to create that fact issue now here at the appellate level. But all of those five citations to testimony that was not presented to the district court are waived. And with respect to what the district court had to look at, the district court only looked at and analyzed what the university put in front of the district court as a basis for there being some type of fact issue. And very charitably- And what was that basis? The university had argued that there was language in the agreement with respect to requiring a separate license agreement to be negotiated in good faith. They cited Ms. Miller Nicholson's testimony. It's in your appendix at page 234. It's her testimony at page 175, lines 5 through 21 of the transcript. But that's the substantive testimony that the university cited. The red lines weren't in favor of the university.  What was their argument? That her testimony preserved the notion that there could be a contract action? That's right. That somehow her testimony was part and parcel with obligating Micron to take a commercial license upon commercialization. And then they also argued with respect to there being a separate requirement to negotiate a license in good faith. But when you look at that testimony, that testimony is really just about the fact that to choose whether or not it would seek a license. And then the university was obligated to negotiate in good faith to reach that license. And that's the obligation that's created by Section 2C upon the university with respect to the natural reading of the language. What in the contract creates that option? I kind of know the answer, but I'm asking you, what in the contract creates the option that we're talking about? Well, it's the first four words of Section 2C, if company wishes to license. I guess that's five words, Your Honor. So if you wish, then something happens. And then we have the word then. Then, right. Something else happens. Right. It's like an if-then statement in C programming. It's if the condition occurs, then something else will occur. And the first condition... So we're looking at the word wishes as, you know, if you would like to, as opposed to if Micron wants to commercialize. That's correct. Going to commercialize. Yeah. I would say going to commercialize or has commercialized would be... Wants to commercialize. Right. But the wishes language... What's the difference between wants and wishes? Wants and wishes, I think they're probably fairly similar. But the wishes language... But desires. Desires. Same. Right. If Micron desires to license, that may have been a different way to say it. But this contract here very clearly puts the predicate determination whether or not Micron has wished to license from the university. As opposed to if it desires to commercialize. As opposed to if it desires to commercialize. I see different meanings in the words if you stop after to license. But the contract goes on and says to license for commercial use. What can't that be read if Micron desires to use commercially? Or if Micron wants to commercialize. Isn't that what this is also saying? No, that's not what this is also saying. Because it says if... You have to read the clause together. If company wishes to license for commercial use. And in context, the license that the university referred to is not a commercial license that requires royalties like we typically think about in these patent infringement cases. They're talking about some type of limited license that limits the use of the treated wafers to testing, inspecting, and use. So for instance, there may be... More to your point, Judge Reyna. There may be experimental uses. There may be commercial uses. The minute we get into commercial use, we're talking about third-party involvement. I'm sorry? As soon as we use the word commercial use, we're talking about third-party involvement. I'm not sure I understand third-party involvement. But I mean, it's possible that third parties could be involved. But to license for commercial use, that would suggest... Micron is a very highly sophisticated company that's involved in licenses and in all aspects of IP law. And it just... Look at the words for commercial use. Because that's the allegation of the breach, that you ultimately used the intellectual property of the university for commercial use. Micron's not excluding the words commercial use. But those words just describe the type of license that would be obtained if Micron wished to... No, no. It describes the type of use, not the license. It has nothing... It said if you're going to use the IP for commercial use, commercially, if you're going to use it, forget about the licenses. That comes later. Perhaps it would be a type of field of use limitation that would be included in a license that Micron wished to obtain down the line. But to a sophisticated party like Micron, why doesn't commercial use mean involvement of a third party? Well, Micron can manufacture and sell its own products. I'm trying to understand your question there, Your Honor. But commercial use would suggest that there's a type of commerce. Can you address Mr. Summerfield's point that under your interpretation of this provision, there's really no point for this provision to have been included in the working agreement? Well, Your Honor, this is just a simple work agreement between the parties. The... Micron was going to send his engineer over to the university because the university had a piece of equipment, an annealed chamber where they could introduce deuterium gas. And in this work agreement, Micron went over, took eight to 10 silicon wafers of half manufactured DRAM, and then processed it. And then if you look at clause 5C of the work agreement, there at page 93 of the appendix, it gives publication rights to the university and it states that the university and its researchers will have the right to publish or otherwise disclose the results of work performed by the university. So the university was getting something under this agreement. And with respect to section 2C, I think the university's argument is premised on a false premise that every single term in an agreement must somehow provide a benefit to the university. We see in agreements, license agreements, for example, all the time that there are releases. Releases go one way to one party, and then the next paragraph has a release that goes the other way to the other party. That's just how agreements are written. But there's no indication that the university wasn't going to benefit from this agreement in some way, shape, or form through Micron's know-how, Micron's investment in billions of dollars into its fabs in order to be able to create these commercially viable products that were then tested with the university's alleged processes. The thing is that these tests were a complete failure and that Micron didn't pursue the work any longer with respect to those treated wafers. And there's no allegation that Micron has breached the agreement with respect to those treated wafers. I see that. Thank you, Mr. Schwartz. We're out of time. Mr. Summerfield, you have two minutes. Thank you, Your Honor. I don't think I could have said it better than Mr. Schartzer as to what benefit Micron derived from the university's work. It was seeing whether it was worth investing money in a process that it asked the university to perform. And the fact it was a failure, assuming that Mr. Schartzer is correct, told Micron that wasn't the thing to invest money in. They did, however, use an annealing process that used the university's intellectual property later on. I'd like to turn to the extrinsic evidence that the Court addressed with Mr. Schartzer. First of all, this is Appendix Pages 8 and 9. It's the decision below. The change in the language of the agreement. What the judge cited was Ms. Miller-Nicholson's testimony that the changes to the licensing paragraph, quote, had meaning. Mr. Schartzer took the deposition of Ms. Miller-Nicholson but never asked what that meaning was. And in fact, there were more changes to this particular provision, Provision 2C, than just the issue about the commercial license. For example, the acknowledgement by the company that the university had proprietary interest in intellectual property was changed to what the university represented. So the record is completely devoid of what that change actually meant. This is something for the jury to determine. It's not a clear fact issue that could be resolved on summary judgment. Next, Ms. Miller-Nicholson's testimony. This is on Page 9 of the appendix. Her answer. If they were using anybody's patents without license and they could be pursued and sued. That is a true statement, which is why we are here. They were pursued and sued because they didn't enter into the requisite commercial license. So again, to determine that this testimony somehow means that Mike Braun had... But she didn't say they could be sued for breach of contract. She was talking about being sued for infringement. She didn't say, Your Honor. That's the point. She didn't say they could be sued for patent infringement. I think the context arguably is pretty clear that that's what she was talking about. It may be arguably clear, Your Honor, but that's not for the court to resolve on summary judgment. And then finally, Mr. Scharzer's point that what she was doing in saying the most reasonable interpretation was ours, somehow just parroting back what we said. If you look at Page 8 of the appendix, she said in an earlier order, denying one of Mike Braun's motions to dismiss, the court determined that the university's interpretation was reasonable. She wasn't just adopting our position. She actually made that finding. Okay. All right. Thank you. We're out of time. Thank both counsel. The case is submitted. Why don't you just stay at the same table for the next case?